UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LISA WINIECKI, individually and on behalf of a class of similarly situated persons, ) ) ) ) Plaintiff, ) ) v. ) ) CREDITORS INTERCHANGE ) RECEIVABLE MANAGEMENT, ) LLC and ECAST SETTLEMENT ) CORPORATION, ) ) Defendants. ) ) | No. 13 C 3461<br><br>Chief Judge Rubén Castillo |
| ECAST SETTLEMENT CORPORATION ) ) ) Third-Party Plaintiff, ) ) v. ) ) MERCANTILE ADJUSTMENT BUREAU, ) LLC, ) ) Third-Party Defendant. ) ) | |

## MEMORANDUM OPINION AND ORDER

Defendant/Third-Party Plaintiff eCAST Settlement Corporation ("eCAST") filed a third-party complaint against Third-Party Defendant Mercantile Adjustment Bureau, LLC ("Mercantile") seeking contractual indemnification. eCAST and Mercantile's dispute arises from a putative class action lawsuit, which has since settled, against Defendant Creditors Interchange Receivable Management, LLC ("Creditors") and eCAST alleging that they violated the Fair Debt

Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (R. 1, Compl. ¶ 19.) eCAST's third-party complaint alleges that, pursuant to an asset purchase agreement between Mercantile and Creditors, Mercantile is the successor to Creditors's liabilities, including a duty to indemnify eCAST. (R. 54, Third-Party Comp. ¶¶ 14, 16, 28.) Presently before the Court are the parties' cross-motions for summary judgment (R. 107, Mercantile's Mot. Summ. J.; R. 117, eCast's Mot. Summ. J.) and eCAST's motion to compel (R. 96, Mot. to Compel). For the reasons stated below, Mercantile's motion for summary judgment is denied, and eCAST's motion for summary judgment is denied in part and granted in part. The Court denies eCAST's motion to compel.

## RELEVANT FACTS

### I. The Parties

Plaintiff Lisa Winiecki ("Plaintiff") resides in the Northern District of Illinois. (R. 110, Mercantile's Facts ¶ 1.) Defendant Creditors was a Delaware limited liability company that did business in Illinois, but is no longer in business. (*Id.* ¶ 2.) Defendant/Third-Party Plaintiff eCAST is a Delaware corporation, with its principal place of business in New York. (R. 119, eCAST's Facts ¶ 1.) Third-Party Defendant Mercantile is a New York corporation. (R. 110, Mercantile's Facts ¶ 4.) Creditors, eCAST, and Mercantile are in the business of collecting defaulted consumer debts. (R. 119, eCAST's Facts ¶¶ 2-4; R. 110, Mercantile's Facts ¶¶ 3, 8, 37.) Specifically, eCAST purchases and collects consumer debts originally owed to others and it hires third-party vendors—such as Creditors and Mercantile—to assist in the debt collection efforts. (*Id.*)

### II. The Servicing Agreement

On October 15, 2004, eCAST and Creditors entered into a servicing agreement (the "Servicing Agreement"), by which Creditors would provide collection services for eCAST's

accounts.[1] (R. 135, Servicing Agreement.) Mercantile was not an original party to the Servicing Agreement. (*Id.*; *see also* R. 110, Mercantile's Facts ¶ 21.)

Relevant to this dispute, the Servicing Agreement contained an indemnification provision. Specifically, Section 6.1 of the Servicing Agreement states:

HOLD HARMLESS-INDEMNITY

> 6.1 <u>INDEMNIFICATION BY AGENCY</u>
>
> (a) Agency [Creditors] shall indemnify and hold Client [eCAST] and its Affiliates, and their respective officers, hectors [sic], employees and agents (each and all, a "Client Indemnified Party" or "Client Indemnified Parties") harmless from and against any Losses, arising out of, connected with or resulting from (i) any act or omission of Agency or any [sic] its officers, directors, shareholders, employees or agents (including Agencys [sic] retained by Agency) in the performance of any duties under this Agreement or with respect to the servicing of the Accounts at any time; (ii) any breach by Agency of Agency's Obligations hereunder, including, without limitation, its obligation to ensure compliance by its employees and agents with Applicable Law; (iii) any breach of any agreement or arrangement between Agency and any other Person; and (iv) any claim, demand, allegation, offset, defense or counterclaim which, if true or proven, would give rise to indemnity under any of Subsections (a) or (b) of this Section 6.1.
>
> (b) However, paragraph 6.1(a) above shall not require indemnification of any Client Indemnified Party by Agency to the extent that an action requiring indemnification by Agency was caused by the negligence, intentional misconduct of a Client Indemnified Party (in the case of indemnification of Client) or any of its respective officers, directors, employees, affiliates, subsidiaries, designees, agents, past employees or any third party utilized by Client, relating to the performance of this Agreement.

(R. 135, Servicing Agreement ¶ 6.1.)

The Servicing Agreement also includes a procedure for either party to invoke the indemnification provision. Section 6.3 states:

---

[1] Mercantile and eCAST have submitted specific exhibits under seal. (R. 114, 123, 135.) To the extent this Order discusses any content previously filed under seal, the party that originally filed that document must file on the Court's docket a public version of the same. The public version should leave visible any content referenced herein. *See City of Greenville, Ill. v. Syngenta Crop Protection, LLC*, 764 F.3d 695, 697 (7th Cir. 2014).

3

6.3 INDEMNIFICATION PROCEDURE.

Each party shall promptly notify the relevant Client or Agency Indemnified Parties (each such Person, an "Indemnified Party"), as applicable, of any claim, demand, suit or threat of suit of which it becomes aware that might give rise to a right of indemnification pursuant to this Agreement, and such Person shall cooperate with one another in the settlement or defense of any such claim, demand, suit or proceeding. . . .

(*Id.* ¶ 6.3.)

In addition, the Servicing Agreement contained an assignment clause, which states:

11.6 ASSIGNMENT

Neither this agreement nor any rights or duties hereunder may be assigned or delegated by Agency in whole or in part, by operation of law or otherwise, without the prior written consent of Client. However, Client may assign this Agreement, and all of their respective rights and obligations hereunder, to any party that becomes a successor in interest by reason of having purchased all or substantially all of the stock, assets or business of Client. Client shall provide written notice to Agency 30 days prior to any assignment. This Agreement shall be binding on the parties' permitted assignees.

(*Id.* ¶ 11.6.)

### III. The Asset Purchase Agreement

On October 22, 2012, Creditors, as part of bankruptcy proceedings, entered into an asset purchase agreement with Mercantile ("Asset Purchase Agreement" or "APA"), whereby Mercantile purchased certain assets and assumed certain liabilities of Creditors. (R. 114-4, APA; R. 110, Mercantile's Facts ¶ 26.)

Section 1 of the Asset Purchase Agreement sets forth the assets purchased and excluded from the sale. Section 1.1 states:

Purchase and Sale of Assets

1.1 Agreement to Purchase and Sell. On the terms and conditions contained in this Agreement, at the closing, Purchaser shall purchase from Seller, and Seller shall sell, convey, assign and deliver to Purchaser, free of all Liens (other than as specifically stated in this Agreement) all right, title and interest in and to all of the

4

assets and properties of Seller of every kind and description, owned or used by Seller in the conduct of Seller's Business other than the Excluded Assets, as defined below (all of such assets, properties and rights to be acquired by Purchaser hereunder, other than the Excluded Assets, collectively referred to as . . . CI Assets" or "Purchased Assets"). The CI Assets shall include wherever located (except to the extent included within the definition of Excluded Assets) . . .

> (d) **all of Seller's rights to all contracts and agreements** (collectively, "Assumed Contracts") . . . .

(R. 114-4, APA ¶ 1.1 (emphasis added).)

Section 2 of the Asset Purchase Agreement sets forth the liabilities assumed and excluded in the transaction:

Assumption of Liabilities

2.1    Assumed Liabilities. On the terms contained in this Agreement, at the Closing, Purchaser shall assume and agree to discharge and perform when due the following (and only the following) liabilities of Seller (the "Assumed Liabilities") . . .

(c)    **liabilities of Seller under any Assumed Contract** by which Seller is bound as of the closing Date, which was made, incurred or issued (as the case may be) in the ordinary course of business and which is a Purchased Asset under this Agreement, to the extent such liabilities arise and are incurred on or following the Closing Date . . . .

2.2.    Excluded Liabilities. Except as provided in Section 2.1, (a) Purchaser shall not assume and shall not be responsible or otherwise be liable for any liabilities or obligations of Seller, whether accrued, matured, unmatured, absolute or contingent, whether known or unknown, whether due or to become due and regardless of when asserted, and (b) Purchaser shall not be responsible for any costs, attorney fees or damages awarded in the defense of any claims put forth by any creditor of Seller. ([C]ollectively, the "Excluded Liabilities").

(R. 114-4, APA ¶¶ 2.1, 2.2 (emphasis added).)

## PROCEDURAL BACKGROUND

On May 8, 2013, Plaintiff filed this putative class action lawsuit against Creditors and eCAST (hereinafter, the "Winiecki Lawsuit") alleging that they violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"). (R. 1, Compl. ¶ 19.) Specifically, Plaintiff

5

alleged that, on May 11, 2012, she received "a confusing and misleading collection letter" from Creditors (the "Winiecki letter") offering a settlement on one or more consumer credit card accounts held by eCAST, which she claimed violated the FDCPA. (R. 1, Compl. ¶¶ 16-19.) Plaintiff did not name Mercantile in the original complaint, and it is undisputed that Mercantile was not involved in any attempts to collect a debt from Plaintiff. (R. 128, eCAST's Resp. to Mercantile's Facts ¶¶ 10, 11.)

Creditors did not appear, answer, or otherwise plead and, on July 9, 2013, the Court defaulted Creditors. (R. 31, Default Order.) On January 27, 2014, the Court denied eCAST's motion to dismiss. (R. 48, Mem. Op. & Order.) Subsequently, a class settlement was reached between Plaintiff and eCAST and, on January 14, 2015, the Final Approval Order was issued by this Court. (R. 80; 9/8/2014 Minute Entry; R. 95, Final Approval Order.) The settlement provided for $45,000 in attorneys' fees to Plaintiff's counsel and $26,500 in total funds to be allocated among Plaintiff and other potential class members. (R. 92, Pl.'s Mem. in Support of Class Settlement Agreement at 4; *see also* R. 95, Final Approval Order §§ D, E; R. 119, eCAST's Facts ¶ 17.)

On June 12, 2013, eCAST notified Mercantile of the Winiecki Lawsuit and requested indemnification pursuant to Section 6.3 of the Servicing Agreement. (R. 119, eCAST's Facts ¶ 14; R. 123-1, Exs. 4, 5 to eCAST's Facts.) Mercantile disclaimed any duty to indemnify eCAST. (R. 119, eCAST's Facts ¶ 15; R. 123-1, Ex. 6 to eCAST's Facts.) Thus, on March 6, 2014, eCAST impleaded Mercantile as a Third-Party Defendant. (R. 54, Third-Party Comp.) The Third-Party Complaint alleges that, on October 22, 2012, Mercantile "purchased" Creditors and, therefore, is the "successor to [Creditors's] obligations under the Servicing Agreement" and is

"obligated to indemnify eCAST for any Losses . . . that eCAST incurs arising out of, connected with, or resulting from, this action and the [Winiecki Lawsuit] . . . ." (*Id.* ¶¶ 14, 28.)

eCAST and Mercantile have both moved for summary judgment on the issue of whether Mercantile is contractually obligated to indemnify eCAST. (R. 107; R. 117.) First, the Court turns to the cross-motions for summary judgment.[2]

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). In deciding a motion for summary judgment, the Court does not evaluate the weight of the evidence, judge the credibility of the witnesses, or determine the ultimate truth of the matter; instead, it is the function of the Court to ascertain whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable

---

[2] While there is no independent jurisdictional basis for eCAST's third-party complaint, the Court may exercise supplemental jurisdiction over it pursuant to 28 U.S.C. § 1367. The Seventh Circuit has made clear that district courts have supplemental jurisdiction over claims brought by an original defendant against a third-party defendant arising out of the "same occurrence or transaction" as the original claim, even if the third-party defendant is non-diverse. *Miller v. Long-Airdox Co.*, 914 F.2d 976, 977 (7th Cir. 1990). Given that the Winiecki Lawsuit involved a collection letter that was sent by Creditors on behalf of eCAST (pursuant to the terms of the Servicing Agreement between Creditors and eCAST), and that eCAST's claim for indemnification against Mercantile arise out of the rights and obligations of the same Servicing Agreement, the standard is met in this case. Thus, the Court will exercise supplemental jurisdiction over eCAST's third-party claim against Mercantile.

7

jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa County, Wis.*, 752 F.3d 708, 712 (7th Cir. 2014) (internal quotation marks omitted).

"Federal Rule of Civil Procedure 56 imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary." *Stark v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* (internal quotation marks omitted). If the movant carries this burden, "the non-movant . . . must make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation marks omitted). In addition, the non-movant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict' in their favor." *Id.* (internal quotations and alterations omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The nonmoving party must show that there is evidence upon which a jury reasonably could find for [it]." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008) (internal citation omitted). Finally, on cross-motions for summary judgment, the Court will "construe all facts and inferences in favor of the party against whom the motion under consideration is made . . . ." *United Cent. Bank v. KMWC 845, LLC*, 800 F.3d 307, 310-11 (7th Cir. 2015).

## ANALYSIS

### I. The Cross-Motions for Summary Judgment

eCAST argues that it is entitled to summary judgment because the plain language of the Asset Purchase Agreement establishes that Mercantile assumed Creditors's liabilities, including a duty to indemnify. (R. 118, eCAST's Mot. Summ. J. at 6-8.) Conversely, Mercantile asserts

8

that it is entitled to summary judgment and that it is not obligated to indemnify because: (1) Mercantile did not expressly or impliedly assume liability in the Asset Purchase Agreement; (2) eCAST is precluded from claiming Mercantile is the successor to any liability because eCAST "never consented in writing to Mercantile assuming Creditors'[s] rights and responsibilities under the Servicing Agreement"; and (3) even if Mercantile did assume the Servicing Agreement, eCAST is not entitled to indemnification because eCAST was negligent in its review of the Winiecki letter and the Servicing Agreement does "not provide for indemnification where the allegedly wrongful act was also caused by the negligence or intentional misconduct of eCAST." (R. 112, Mercantile's Mot. Summ. J. at 8-12.)

### A. Successor Liability

"Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities."[3] *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006). However, there are four exceptions to this rule. A buyer of a corporation's assets will be liable as its successor if: "(1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *Id.* The second, third, and fourth exceptions are not at issue here. Instead, both eCAST's and Mercantile's motions for summary judgment focus on the first exception—whether Mercantile expressly or impliedly assumed Creditors's liabilities. (R. 118, eCAST's Mot. Summ. J. at 7-11;

---

[3] The Asset Purchase Agreement and Servicing Agreement provide that New York law shall govern, and neither party contests the choice of law provisions. (R. 114-4, APA § 7.9; R. 135, Servicing Agreement § 11.4; R. 118, R. eCAST's Mot. Summ. J. at 7; R. 132, Mercantile's Resp. to eCAST's Mot. Summ. J. at 3.) Therefore, the Court will apply New York law to this dispute.

9

R. 132, Mercantile's Resp. to eCAST's Mot. Summ. J. at 3-10; R. 112, Mercantile's Mot. Summ. J. at 7-11; R. 130, eCAST's Resp. to eCAST's Mot. Summ. J. at 2-5, 7.)

The parties dispute whether, under the terms of the Asset Purchase Agreement, Mercantile assumed the rights and obligations arising under the Servicing Agreement, including the duty to indemnify. (*Id.*) Under New York law, unambiguous contracts are interpreted as a matter of law. *See Metro. Life Ins. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("Under New York Law, contracts are interpreted . . . by the court as a matter of law when the contract language is unambiguous."); *Alt. Thinking Sys., Inc. v. Simon & Schuster, Inc.*, 853 F. Supp. 791, 795 (S.D.N.Y. 1994) ("Under New York Law, if a contract is unambiguous on its face, its interpretation is a question of law."). A contract is unambiguous when the "language has a definite and precise meaning" and "there is no reasonable basis for a difference of opinion." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (internal quotation marks omitted). When a contract is wholly unambiguous, summary judgment is appropriate. *See Burke v. Ulico Cas. Co.*, 165 F. App'x 125, 126-27 (2d Cir. 2006).

Applying those principles here, the Court concludes that the Asset Purchase Agreement is unambiguous, and the plain language of Sections 1.1, 1.2, and 2.1 demonstrates that Mercantile expressly assumed the Servicing Agreement, including the obligation to indemnify. Section 1.1(d) of the Asset Purchase Agreement sets forth the "Purchased Assets," which include the "Assumed Contracts." (R. 114-4, APA § 1.1(d).) "Assumed Contracts" is defined as: "*all* of Seller's rights *to all contracts and agreements*." (*Id.* (emphasis added).) Simply put, the Purchased Assets included all of Creditors's contracts and agreements; thus, the plain language of the Asset Purchase Agreement demonstrates that Mercantile purchased all of Creditors's contracts and agreements, including the Servicing Agreement. Put another way, the Servicing

Agreement was a contract of Creditors (the seller); Creditors enjoyed specific rights under the Servicing Agreement; and, in turn, Mercantile (the purchaser) purchased those rights.

Mercantile spends little time addressing the plain language of Section 1.1. However, Mercantile urges the Court to read the Asset Purchase Agreement "as a whole" in order to determine that the Servicing Agreement was not an Assumed Contract or that Mercantile only undertook certain obligations under the Servicing Agreement. (R. 132, Mercantile's Resp. to eCAST's Mot. Summ. J. at 4-5.) Specifically, Mercantile states that it "merely purchased some of Creditors' assets," is "a non-party to the Servicing Agreement," and did not "purchase the Winiecki account as part of the Asset Purchase Agreement." (R. 133, Mercantile's Resp. to eCAST's Facts ¶¶ 23-24; R. 111, Gray Aff. ¶¶ 5, 7; R. 132, Mercantile's Resp. to eCAST's Mot. Summ. J. at 9.) Mercantile's position is contrary to the plain language of the Asset Purchase Agreement.

The Asset Purchase Agreement does not expressly exclude the Servicing Agreement. Section 1.2 of the Asset Purchase Agreement provides a list of twelve categories of "Excluded Assets." (R. 114-4, APA § 1.2.) The Excluded Assets list does not include the Servicing Agreement, any portion of the Servicing Agreement, or the Winiecki Account. (*Id.*) In addition, Mercantile fails to identify a specific Excluded Asset that arguably encompasses the Servicing Agreement or the Winiecki account. Thus, while Mercantile claims that it did not purchase the Servicing Agreement or certain accounts falling under the Servicing Agreement, the plain language of the Excluded Assets section of the Asset Purchase Agreement indicates otherwise.

The Asset Purchase Agreement also demonstrates that Mercantile expressly assumed certain liabilities of Creditors. Specifically, Section 2.1 of the Asset Purchase Agreement provides that Mercantile "shall assume and agree to discharge and perform when due the . . .

liabilities of Seller [Creditors] under any Assumed Contract by which Seller is bound as of the Closing Date, which was made[] [or] incurred. . . in the ordinary course of business and which is a Purchased Asset under this Agreement, to the extent such liabilities . . . are incurred on or following the Closing Date . . . ." (R. 114-4, APA § 2.1(c).) The Winiecki liability, including the obligation to indemnify eCAST, arose "on or following" the October 22, 2012, asset purchase closing. (*Id.*) A cause of action for indemnification does "not accrue until payment is made by the party seeking reimbursement." *Korean Air Lines Co., Ltd. v. Port Auth. of N.Y. & N. J.*, No. 10-CV-2484, 2012 WL 6967232, at *5 n.4 (E.D.N.Y. Aug. 1, 2012); *see also McDermott v. City of New York*, 406 N.E.2d 460, 461 (N.Y. 1980) ("Indemnification claims generally do not accrue for the purpose of the Statute of Limitations until the party seeking indemnification has made payment to the injured person."); *Merch. Ins. Grp. v. Mitsubishi Motor Credit Ass'n*, No. 03-CV-6017, 2005 WL 1631145, at *1 (E.D.N.Y. July 11, 2005) ("Technically a claim for indemnity does not arise until the prime obligation to pay has been established."). eCAST began to incur legal fees on or after May 8, 2013—the date on which the Winiecki lawsuit was filed. In addition, eCAST incurred the cost of settlement on or around January 14, 2015—the date the Court entered the Final Approval Order. Thus, pursuant to Section 1.1(d) of the Asset Purchase Agreement, the Servicing Agreement is an Assumed Contract; and, pursuant to Section 2.1(c), Mercantile expressly assumed Creditors's liabilities arising on or after October 22, 2012, including the obligation to indemnify eCAST.[4] Therefore, the Court concludes that eCAST is

---

[4] Mercantile's repeated actions subsequent to the asset purchase further demonstrate that the Servicing Agreement was an Assumed Contract under the Asset Purchase Agreement. Immediately following the asset purchase, Mercantile collected on eCAST accounts, sent eCAST remittances, accepted commissions from eCAST for these services, and continued to service existing accounts until March 27, 2013. (R. 133, Mercantile's Resp. to eCAST's Facts ¶¶ 29, 31.) In addition, there is no evidence that Mercantile ever attempted to terminate the Servicing Agreement. In fact, following the asset purchase, Mercantile sought additional business from

entitled to summary judgment because Mercantile expressly assumed Creditors's liabilities, including the duty to indemnify eCAST.

### B. Assignability of the Servicing Agreement

While this Court concludes that eCAST is entitled to summary judgment as to whether Mercantile expressly assumed the liabilities of Creditors under the Asset Purchase Agreement, the inquiry does not end here. Mercantile raises a cursory argument that it cannot be the successor to any of Creditors's liabilities because the Servicing Agreement between Creditors and eCAST "specifically prohibited Creditors from transferring its rights and responsibilities under the Servicing Agreement unless eCAST consented to doing so in writing." (R. 112, Mercantile's Mot. Summ. J. at 11.) In Mercantile's view, eCAST did not provide the requisite consent. (*Id.*) Mercantile does not cite any case law in support of its position, and it is counter to the applicable law.

Under New York law, provisions in contracts that forbid or restrict assignment of a contract are valid and enforceable. *See BSC Assoc., LLC v. Leidos, Inc.*, 91 F. Supp. 3d 319, 323-24 (N.D.N.Y. 2015). However, a prohibition against assignment may be waived. *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, No. 93 CIV. 6876, 2000 WL 1876915, at *2 (S.D.N.Y. Dec. 22, 2000); *see also Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir. 1983) ("[A] specific prohibition against assignments made without written consent may be waived in

---

eCAST. (*Id.* ¶ 30.) These undisputed facts demonstrate—in line with the *express* terms of the Asset Purchase Agreement—that Mercantile considered the Servicing Agreement to be an Assumed Contract under the terms of the Asset Purchase Agreement. Mercantile cannot act as if the Servicing Agreement was an "Assumed Contract" for purposes of servicing the contract and collecting commissions, but thereafter claim that it was not an "Assumed Contract" for purposes of assumption of liability and obligations. *See, e.g., Rosado v. Royal-Pak Systems, Inc.*, No. 96 CIV 6741, 1999 WL 105033, at *4 (S.D.N.Y. Mar. 1, 1999) (rejecting company's argument that it only assumed "service and maintenance obligations" but not any liabilities associated with those obligations, and noting that the company's conduct demonstrated that it had expressly assumed liability).

13

favor of an assignee[.]"). Waiver may be achieved by "a course of business dealings." *University Mews Assocs. v. Jeanmarie*, 471 N.Y.S.2d 457, 461 (N.Y. Spec. Term 1983).

In addition, "with limited exception, contractual provisions prohibiting assignments are treated as personal covenants." *BSC Assoc.*, 91 F. Supp. 3d at 323 (internal quotation marks omitted). "An assignment that violates a personal covenant prohibiting assignments gives rise to an action for damages against the assignor, but is enforceable." *Id.*; *see also Pro Cardiaco Pronto Socooro Cardiological S.A. v. Trussell*, 863 F. Supp. 135, 137-38 (S.D.N.Y. 1994) ("an assignment made in violation of a personal covenant prohibiting assignments is enforceable, although it does give rise to a damages action against the assignor"). "The limited exception is when the relevant provision of the contract contains clear, definite, and appropriate language declaring an assignment invalid." *Purchase Partners, LLC v. Carver Fed. Sav. Bank.*, 914 F. Supp. 2d 480, 505 (S.D.N.Y. 2012) (internal quotation omitted). Put another way, in order for an assignment to be void and unenforceable, the anti-assignment clause must include voiding language such as "assignment . . . shall be void" or "an assignee would acquire no rights by reason of any . . . assignment." *Pro Cardiaco*, 863 F. Supp. at 138. *See also BSC Assoc.*, 91 F. Supp. 3d at 324 (in order for an anti-assignment clause to be void and unenforceable, the clause "must specifically use language to the effect that the assignee receives no rights from an improper assignment or that such assignment is void").

With these principals in mind, the Court turns to Mercantile's argument that the assignment of the Servicing Agreement is void and unenforceable. (R. 112, Mercantile's Mot. Summ. J. at 11.) As an initial matter, the Court concludes that eCAST waived the non-assignment clause. Following the asset purchase agreement, eCAST and Mercantile engaged in repeated business dealings. The parties have attached correspondence and deposition testimony

14

to their motions demonstrating that they continued to conduct business pursuant to the terms of the Servicing Agreement. (*See* R. 114-1, Ex. B to Mercantile's Facts; R. 121-1, Exs. 1, 9, and 10 to eCAST's Facts; R. 123-1, Exs. 7 to eCAST's Facts.) It is undisputed that Mercantile collected on eCAST accounts and continued to service existing accounts until March 27, 2013. (R. 133, Mercantile's Resp. to eCAST's Facts ¶¶ 29, 31.) While Mercantile states that eCAST did not provide proper written consent to permit the assignment of the Servicing Agreement to Mercantile, and that eCAST did not "negotiate a new Servicing Agreement with Mercantile after" the asset sale (R. 132, Mercantile's Mot. Summ. J. at 5-6), Mercantile does not provide any evidence demonstrating that eCAST explicitly rejected the assignment. In addition, Mercantile does not offer any argument as to how eCAST's repeated business dealings with Mercantile do not amount to a waiver of the non-assignment clause. When considering the evidence in the light most favorable to eCAST, the record demonstrates that eCAST knew of the assignment of the Servicing Agreement from Creditors to Mercantile, accepted the assignment, and freely began to conduct business with Mercantile.

Further, regardless of whether eCAST waived the non-assignment clause, the assignment remains valid. The non-assignment clause does not contain any language indicating that an assignment would be void (R. 135, Servicing Agreement ¶ 11.6.). Therefore, the assignment of the Servicing Agreement from Creditors to Mercantile is valid and enforceable. *See Pro Cardiaco*, 863 F. Supp. at 138-39; *BSC Assoc.*, 91 F. Supp. 3d at 324. In addition, the remedy for the violation of the anti-assignment clause is a claim for damages against the assignor, Creditors. The remedy is not, as Mercantile urges, voiding the assignment. *See Macklowe*, 170 A.D.2d at 389; *Pro Cardiaco*, 863 F. Supp. at 137-38; *Purchase Partners*, 914 F. Supp. 2d at 505. As such, Mercantile's motion for summary judgment as to this issue must be denied.

### C. Negligence

Next, Mercantile asserts that even if the assignment of the Servicing Agreement was valid and it is obligated to indemnify eCAST, the terms of the Servicing Agreement do not provide for indemnification where the allegedly wrongful act (the creation and distribution of the Winiecki letter) was caused by the negligence of eCAST. (R. 112, Mercantile's Mot. Summ. J. at 11-13; *see also* R. 135, Servicing Agreement § 6.1(b) (there is no duty to indemnify "to the extent that an action requiring indemnification by [Creditors] was caused by the negligence . . . of [eCAST]").) The Court concludes that a genuine issue of material fact exists as to whether eCAST was negligent, such that summary judgment for neither party is appropriate.

The Servicing Agreement specifically provides for eCAST to audit and review Creditors's "records and operations, and review and approve [Creditors's] forms, practices and procedures . . . ." (R. 135, Servicing Agreement § 2.1.) The record shows that "eCAST routinely and annually asserted its right . . . to review correspondence sent to debtors on its behalf." (R. 128, eCAST's Resp. to Mercantile's Facts at ¶ 13.) In August 2011, eCAST conducted an audit of Creditors, during which eCAST requested and received form letters that Creditors sent to debtors. (*Id.* ¶¶ 14-15.) One of the form letters received and reviewed was identical to the Winiecki letter. (*Id.* ¶ 16.) While eCAST states that it did not "communicate[] its approval of the letter," it also admits that it "did not object to" or "modif[y]" any of the letters that Creditors provided for review. (*Id.* ¶¶ 17-18.)

Mercantile claims that even if it is the successor to Creditors's liabilities (which the Court has concluded that it is), it does not owe a duty to indemnify eCAST because eCAST was negligent during the August 2011 on-site audit of Creditors. (*Id.*) In addition, Mercantile claims that "[t]o the extent Creditors' letter was improper under the FDCPA, eCAST's negligent review

and approval of an improper letter caused the sending of that letter to Winiecki and the class." (R. 132, Mercantile's Resp. to eCAST's Mot. Summ. J. at 11.)

In response, eCAST states that its actions do not demonstrate negligence for several reasons. Specifically, eCAST states that: (1) it had "a contractual right to rely on Creditors to ensure compliance with the FDCPA"; (2) Creditors "was responsible for compliance with the law and 'collection industry standards' in collecting on debts"; (3) two of Creditors's employees "represented to eCAST that they could and would ensure that Creditors['s] letters were FDCPA compliant"; (4) eCAST "reasonably relied on Creditors, an experienced debt collection servicer, to conform the letter to the FDCPA" requirements; and (5) eCAST's audit "weighs against a finding of negligence" because it was done in order to ensure Creditors's compliance with its obligations.[5] (R. 130, eCAST's Resp. to Mercantile's Mot. Summ. J. at 8-11.)

New York courts have consistently denied summary judgment where a contractual duty to indemnify is contingent upon the negligence of a party to the contract. *See, e.g., Wausau Bus. Ins. Co. v. Turner Constr. Co.*, 143 F. Supp. 2d 336, 344 (S.D.N.Y. 2001) (summary judgment for indemnitee premature because right to indemnity dependent upon jury finding of negligence); *Fiske v. Church of St. Mary of the Angels*, 802 F. Supp. 872, 885-86 (W.D.N.Y. 1992) (summary judgment denied because of material issues of fact regarding negligence and control); *In re Bridge Const. Servs. of Fla., Inc.*, Nos. 12 Civ. 3536, 12 Civ. 6285, 13 Civ. 3123, 2015 WL 6437562, at *4 (S.D.N.Y. Oct. 26, 2015) ("Whether this contractual right of indemnification will in fact be triggered cannot be resolved on this motion for summary judgment because it depends on disputed issues of fact concerning whether [the defendant] was negligent and whether that

---

[5] Neither party references or relies upon the settlement agreement from the Winiecki lawsuit to argue that there was a finding of negligence on the part of eCAST or that eCAST conceded that it was negligent.

17

negligence was a proximate cause of the accident."); *Nelson v. Metro-North Commuter R. Co.*, No. 97 Civ. 5392, 1999 WL 92494, at *3 (S.D.N.Y. Feb. 19, 1999) ("[W]here there is a genuine issue of fact as to whether the accident in question was produced by the negligence of the party claiming indemnification, summary judgment is precluded.").

As Mercantile points out, eCAST has admitted that it audited Creditors, reviewed Creditors's policies and procedures, reviewed the form letter sent to Winiecki, and did not object to the substance of the letter or modify the letter. (R. 112, Mercantile's Mot. Summ. J. at 12-13; R. 132, Mercantile's Resp. to eCAST's Mot. Summ. J. at 11-12.) However, eCAST contends that it relied upon Creditors's representations that it had employees who would ensure FDCPA compliance, and the fact that they conducted an audit weighs against a finding of negligence. (R. 130, eCAST's Resp. to Mercantile's Mot. Summ. J. at 8-11.) At this juncture, issues of fact exist as to whether eCAST was indeed negligent and, if so, whether its negligence caused or contributed to the mailing of the Winiecki letter and the subsequent request for indemnification.

Therefore, the Court concludes as a matter of law that, pursuant to the terms of the Asset Purchase Agreement, Mercantile expressly assumed the liabilities of Creditors, including the duty to indemnify arising under the Servicing Agreement. However, because there is a genuine issue of material fact regarding whether eCAST was negligent and, if so, whether its negligence caused or contributed to the mailing of the Winiecki letter, neither party is entitled to summary judgment on eCAST's contractual indemnification claim.

## II. Motion to Compel

Finally, the Court must address eCAST's pending motion to compel. (R. 96.) eCAST served a document request on Mercantile seeking "[a]ll templates or forms for letters sent by Mercantile addressed to accountholders with multiple accounts, drafted, dated, or used from May

9, 2012 through present." (R. 96-1, Ex. A to Mot. to Compel.) Mercantile has objected on numerous grounds, including that the substance of the debt collection letters sent by Mercantile is irrelevant to the issue at hand—whether eCAST was negligent in reviewing Creditors's debt collection letters. (*Id.*; R. 100, Mercantile's Resp. to Mot. to Compel at 3-4.)

eCAST explains that it seeks these documents based upon Mercantile's position that Mercantile "is not liable under the Servicing Agreement because eCAST was negligent in failing to review the letter at issue in the Winiecki Action or instruct Creditors to revise the letter template it sent to Winiecki and other Class members." (R. 96, eCAST's Mot. Comp. at 2.) Simply put, eCAST seeks to examine another debt collector's letters (Mercantile's) in an attempt to establish that eCAST was not negligent in its review of Creditors's letters.

The Court agrees with Mercantile. The documents sought are not relevant. Creditors sent the debt collection letter to Winiecki on behalf of eCAST. The substance of Mercantile's debt collection letters and its efforts to collect debt from other consumers are not at issue in this lawsuit. In addition, Mercantile's position that eCAST was negligent in its review of the Winiecki letter does not give eCAST carte blanche to explore Mercantile's business practices. While there is an issue of fact as to whether eCAST may have been negligent in its review and approval of the Winiecki letter, Mercantile's debt collection efforts have no bearing on that determination.

In any event, the Court cannot compel Mercantile to produce documents that do not exist. *See In re Peregrine Fin. Grp. Customer Litig.*, Case No. 12 C 5546, 2015 WL 1344466, at *12 (N.D. Ill. Mar. 20, 2015) ("A court cannot compel a party to turn over what does not exist."). Mercantile states that it "engaged in a review of its letters and did not find any letters responsive to eCAST's motion to compel." (R. 100, Mercantile's Resp. to eCAST's Mot. Comp. at 6.) In

support, Mercantile submits an affidavit from Bruce Gray, Mercantile's President, indicating that he "did not find any letters similar to Plaintiff Winiecki's letter or otherwise responsive to eCAST's motion to compel" and that "Mercantile does not send settlement offers out on letters with multiple accounts lined in the same letter." (R. 100-3, Ex. 3 to Mercantile's Resp. to eCAST's Mot. to Compel. ) eCAST has not presented the Court with any evidence that would cast doubt on Mercantile's representation that no such documents exist. Thus, because the Court cannot compel Mercantile to produce documents that it does not have, eCAST's motion to compel is denied.

## CONCLUSION

For the reasons stated above, Mercantile's motion for summary judgment (R. 107) is DENIED, and eCAST's motion for summary judgment (R. 117) is GRANTED in part and DENIED in part. In addition, eCAST's motion to compel (R. 96) is DENIED. The parties shall appear for a status hearing on November 23, 2015, at 9:45 a.m., and shall be prepared to set a firm trial date for the remaining issue in this delayed lawsuit. The parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities prior to the status hearing.

ENTERED: _____
**Chief Judge Rubén Castillo
United States District Court**

Dated: 11/4/15